William M. Audet (CA State Bar #117456)
waudet@audetlaw.com
Joshua C. Ezrin (CA State Bar #220157)
jezrin@audetlaw.com
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco CA 94105
Telephone: 415.568.2555
Facsimile: 415.568.2556

Anthony R. Lopez (CA State Bar #149653)
alopez@musicatty.com
LAW OFFICES LOPEZ & ASSOCIATES
9025 Wilshire Blvd., Suite 500
Beverly Hills, California 90211
Telephone:  310.276.4700
Facsimile:  310.861.0509

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRACIELA BELTRAN, individually and on behalf all those similarly situated,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>CAPITOL RECORDS, LLC, f/k/a CAPITOL RECORDS, INC., a Delaware corporation, and EMI GROUP INC, a Delaware corporation,<br><br>                    Defendants. | CASE NO.:  4:12-cv-01002<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT AND JURY TRIAL DEMANDED** |

## **NATURE OF THE ACTION**

1.      Plaintiff, GRACIELA BELTRAN, individually and on behalf all those similarly situated, bring this nationwide class action for breach of contract and statutory violations of California law against Defendants CAPITOL RECORDS, LLC and EMI GROUP INC. (hereinafter collectively "Defendants"), for past and continuing failure to pay Plaintiff and the Class income owed for royalties relating to the licensing of musical performances and/or recordings sold by "Music Download Providers" or "Ringtone Providers" (i.e., "Digital Providers") under the terms of the standard Capitol Records Recording Agreement ("Capitol Agreement").

2.      Defendants in the normal course of business enter into licensing agreements with Digital Content Providers whereby those Providers are permitted to sell Defendants' catalog of master recordings (including those made and/or produced by Plaintiff and the Class under the terms of the standard Capitol Agreement) to consumers via various forms of digital distribution. On information and belief, under their licensing agreements with Music Download Providers, Defendants receive approximately seventy percent (70%) for every licensed, digital download sold by the Music Download Provider to an end user. Under their licensing agreements with Ringtone Providers, Defendants receive approximately fifty percent (50%) of the retail sale price of every licensed, digital Download sold by the Ringtone Provider to an end user.

3.      Under the Capitol Agreement at issue in this case, when Defendants license master recordings to third parties, Defendants are required to pay Plaintiff and the Class a royalty equivalent to fifty percent (50%) of all net receipts received from these third party-licensees (hereinafter "Royalty Provisions"). The Royalty Provisions apply to any and all master recordings licensed by Defendants to Digital Content Providers for their sale through digital distribution.

4.      Defendants improperly treat each Digital Download as a "sale" of a physical product (i.e., CD or LP) through their "Normal Retail Channels," which are governed by much lower royalty provisions in the Capitol Agreement. In doing so, Defendants have: (i) failed to properly account for and pay Plaintiff and the other Class members moneys owed from the

1
SECOND AMENDED CLASS ACTION COMPLAINT          CASE NO.:  4:12-cv-01002

licensing of master recordings to Digital Content Providers; and (ii) underreported the actual number of digital downloads that occur by treating downloads as sales of physical product that might be returned;

5.      During the applicable Class Period, Defendants have, in a wide-spread and calculated effort to compensate for the loss of revenue caused by the proliferation of free music file-sharing services, violated the royalties provision of the Capitol Agreement with Plaintiff and the other Class members by: (i) failing to make proper royalty payments to Plaintiff and Class members and/or failing to properly credit Plaintiff and Class members' royalty accounts, and (ii) improperly withholding royalties and/or credits owed to Plaintiff and the Class as "reserves" for the return of products sold when, in fact, Digital Downloads cannot be returned. As a result of Defendants' ongoing breach of the Royalty Provisions, Plaintiff and Class members have suffered tens of millions of dollars in damages.

6.      Accordingly, Plaintiff seeks damages on behalf of herself and the Class, as well as an accounting and judgment declaring the proper method of calculating payments of royalties or crediting royalty accounts with respect to the licensing of master recordings to third-party Digital Content Providers. Further, Plaintiff requests that this Court order Defendants to adhere to the proper methodology for calculation of such royalties in the future.

### THE PARTIES

7.      Plaintiff GRACIELA BELTRAN is a prominent music artist residing in the State of California. Graciela Beltran known as "La Reina Del Pueblo," is from Costa Rica, a small town in the Mexican state of Sinaloa. She emigrated to the United States as a young child. She started her career at a very young age, performing first for her neighbors, then at restaurants and fiestas. In the intervening years, she has performed at the White House, toured extensively, been featured in numerous television and film appearances, and her compilation album with Selena, entitled Las Reinas Del Pueblo, has sold 5 million copies worldwide.

8.      Defendant CAPITOL RECORDS, LLC, f/k/a CAPITOL RECORDS, INC. ("Capitol"), a division of EMI GROUP, INC., is a corporation duly organized and existing under the laws of the State of Delaware, with it principle place of business in the State of New

*Audet & Partners, LLP*

SECOND AMENDED CLASS ACTION COMPLAINT          CASE NO.:  4:12-cv-01002

York. Capitol Records, LLC, as successor by conversion to, and formerly known as, Capitol Records, Inc., as successor by merger to and formerly known as Virgin Records America, Inc., in its own name and d/b/a Capitol Music Group, Capitol Records, EMI Catalog Marketing, EMI Global Music Services, EMI Music, EMI Music Marketing, EMI Music North America, and EMI Music Operations North America.  Capitol owns and operates, and its predecessors in interests owned and operated, numerous record labels, now or formerly d/b/a Angel Records, Astralwerks, Blue Note Records, Capitol, Capitol Nashville, Capitol Records, EMI Music North America, EMI Latin Records, EMI Nashville, Priority and Virgin. At all relevant times, Capitol was and continues to be in the business of exploiting the sound recordings of musical performances and the audio-visual recordings of such performances of the class members. Capitol's exploitation includes, but is not limited to, producing, manufacturing, distributing, licensing, and selling these recordings.

9.    Defendant EMI GROUP INC. ("EMI"), is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York. At all relevant times, EMI was and continues to be in the business of exploiting the sound recordings of musical performances and the audio-visual recordings of such performances of the class members. EMI's exploitation includes, but is not limited to, producing, manufacturing, distributing, licensing, and selling these recordings.

## **JURISDICTION AND VENUE**

10.    Jurisdiction is premised upon diversity of citizenship pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1711-1715 and 28 U.S.C. §§ 1332(d), in that there is diversity of citizenship, and the amount in controversy exceeds Five Million Dollars ($5,000,000.00).

11.    Venue is proper in the Northern District of California pursuant to 28 U.S.C § 1391(a)(2), et seq., as Defendants transact business in this district and many of the acts complained of herein, including but not limited to the various predicate acts, occurred within this district and/or were known or intended by Defendants to occur in or have consequences in this district.

*Audet & Partners, LLP*

SECOND AMENDED CLASS ACTION COMPLAINT          CASE NO.:  4:12-cv-01002

1

**SUBSTANTIVE ALLEGATIONS**

2

**Music Download Providers**

3     12.     Consumers are increasingly purchasing and downloading digital versions of

4     master recordings directly to their computers or other electronic storage devices ("Music

5     Downloads") from various "Music Download Services" offered by "Music Download

6     Providers." There is no physical packaging and returns are not permitted for Music Downloads.

7     Additionally, Music Downloads often have various restrictions in place to prevent the consumer

8     from copying and/or sharing the Music Download with others. Oftentimes, these restrictions are

9     enforced through a Digital Rights Management system ("DRM") that encrypts the content.

10     13.     In order to allow users to purchase digital copies of the master recordings owned

11     by record labels, Music Download Providers typically must sign licensing agreements with

12     record labels such as Defendants. Depending on the licensing agreement with the record label,

13     Music Download Providers generally either: (a) charge a flat, per-download fee to end users; or

14     (b) operate as a subscription service, allowing consumers to access digital copies of the master

15     recordings for a set monthly fee for as long as they continue paying the monthly subscription

16     charge. Some providers offer both options.

17     14.     Most of the prominent Music Download Providers have signed licensing deals

18     with Defendants and the other prominent record labels to offer Music Downloads to consumers.

19     These providers include, but are not limited to, Amazon.com, Buy.com, iTunes,[1] Liquid Digital

20     Media (walmart.com), Napster, Rhapsody, Microsoft's Zune Marketplace, and eMusic. In fact,

21     the International Federation of the Phonographic Industry ("IFPI"), a worldwide representative

22     of the record industry, estimates that record labels had "licensed" roughly thirteen million tracks

23     of music to over four hundred Music Download Providers by 2010.

24

25

26     [1] When Apple launched its iTunes Store in April 2003, and offered "legal" Music Downloads for, on
       average, 99¢ per track or $9.99 per album, the popularity of digital downloads began to grow exponentially. On

27     February 24, 2010, total music downloads from the iTunes Store reached ten billion tracks. Today, the iTunes Store
       accounts for roughly two-thirds of all Music Downloads. The iTunes store generated $1.4 billion in revenue for

28     Apple in the second quarter of 2011, up from $1.1 billion in the second quarter of 2010.

SECOND AMENDED CLASS ACTION COMPLAINT          CASE NO.:  4:12-cv-01002

Audet &
Partners,
LLP

15.     Music Download Providers obtain licenses from Defendants that authorize these providers to sell or otherwise distribute, via digital download, Defendants' catalog of master recordings, including Plaintiff's recordings as described herein, and the recordings owned and/or controlled by the Class.

16.     On information and belief, under its licensing agreements with Music Download Providers, Defendants do not manufacture or warehouse any physical product or packaging, nor does it ship or sell any product to stores or other distribution points, and faces no risk of breakage or the return of unsold product. Rather, as the Ninth Circuit held in *F. B. T Productions, Inc. v. Aftermath Records*, 621 F.3d 958 (9th Cir. Sept. 3, 2010), cert. denied 79 U.S.L.W. 3370 (March 21, 2011), Defendants are "licensing" as opposed to "selling" their catalog of recordings to Music Download Providers for distribution via digital download by consumers.

17.     The prevalence of Music Download sales by Music Download Providers means that Defendants' continued and improper accounting of royalties owed has deprived Plaintiff and the Class members of tens of millions of dollars in royalties. This is at a time when the music industry as a whole is suffering from significant contraction in the volume of sales.

**Ringtone/Mastertone Providers**

18.     Ringtones that are a portion clip of an artist's actual sound recording (rather than an electronic reproduction, e.g., MIDI) that are played on a mobile phone when someone is calling, texting, or otherwise trying to contact the mobile phone operator are known as "Mastertones."

19.     Mastertones are sold to consumers by "Ringtone Providers." Mastertones range in price between $1.00 and $3.00 per ringtone. Ringtone Providers include, but are not limited to, mobile phone companies (including, but not limited to, AT&T Wireless, Verizon Wireless, Sprint, and T-Mobile), content owners (including, but not limited to MTV and VH1), and third-party aggregators (including, but not limited to, Zed, Hudson Soft, Jamster and iTunes). In general, consumers purchase and download Mastertones directly from their mobile phones.

SECOND AMENDED CLASS ACTION COMPLAINT          CASE NO.:  4:12-cv-01002

Audet & Partners, LLP

20. On information and belief, in order to sell Mastertones to consumers, Ringtone Providers must enter into license agreements with Defendants and other record labels that authorize Ringtone Providers to use those labels' master recordings to produce Mastertones for sale to consumers. In return, the Ringtone Providers pay the record labels approximately fifty percent (50%) of the retail sales price of the Mastertone.

21. Record labels have made billions of dollars from their licensing agreements with Ringtone Providers. Globally, Mastertone sales reached roughly $4 billion in 2004. In the United States alone, Mastertone sales reached $714 million in 2007 and $541 million in 2008.

22. Mastertones play an important role in the record industry's revenue stream. The Recording Industry Association of America ("RIAA") has added its Gold and Platinum recognition program to Mastertone sales. In 2006, the RIAA awarded Gold Status (500,000 downloads) to 84 Mastertones, Platinum Status (1,000,000 downloads) to 40 Mastertones, and Multi-Platinum Status (2,000,000 downloads or more) to 4 Mastertones.

23. On information and belief, under its licensing agreements with Ringtone Providers, Defendants do not manufacture or warehouse any physical product or packaging, nor do they ship or sell any product to stores or other distribution points, and faces no risk of breakage or the return of unsold product. Rather, Defendants are licensing their catalog of master recordings to Ringtone Providers as they do with Music Download Providers, for sale or distribution by them via digital download to consumers.

24. The agreements between Digital Content Providers and Defendants that allow these providers to distribute Defendants' master recordings for sale through digital downloads are "licenses" or "leases" and subject to the royalty provisions for such clauses. Defendants' continued, improper accounting of royalties owed to Plaintiff and Class members has deprived Plaintiff and the Class of tens of millions of dollars in royalties.

**The Capitol Recording Agreement**

25. The Capitol Agreement is used with primarily musical artists and producers. Under the Capitol Agreement, Plaintiff and the Class agree to transfer title to master recordings

SECOND AMENDED CLASS ACTION COMPLAINT          CASE NO.: 4:12-cv-01002

*Audet & Partners, LLP*

1  to allow Defendants to engage in the commercial exploitation of said recordings. In return,

2  Defendants agree to pay the recording artists and producers royalties set forth in the Agreement.

3      26.    The Capitol Agreement sets forth and governs the calculation, distribution, and

4  payment of all royalties to Plaintiff and each Class member. On information and belief, these

5  royalties are computed electronically through various software programs that Defendants

6  control and maintain. Thus, the amount owed to Plaintiff and any Class member is a matter of

7  simple calculations through adjustment of these software programs.

8      27.    In accordance with industry practice, the Capitol Agreement sets forth the same,

9  or substantially the same, two equations for all Class members. The royalties owed to these

10  artists and performers equals the sum of two equations: (i) Royalties for physical products sold

11  by Defendants and their affiliates in the United States and abroad ("sold equation"); and (ii)

12  Royalties for master recordings licensed by Defendants to third parties ("licensed equation").

13      28.    These equations were drafted by Defendants and their predecessors-in-interest

14  and were non-negotiable terms of all Capitol Recording Agreements. While Defendants'

15  agreements may have varied slightly in non-material ways, every recording agreement that is

16  part of this Class contains these standard equations.

17      29.    The Capitol Agreement provided a significantly higher percentage of royalties

18  under the licensed equation than under the sold equation. In general, the sold equation provides

19  for royalties of eighteen percent (18%) (depending on the popularity of the artist, album and

20  price the record was sold at; i.e., the more popular the artist, or the more expensive the album,

21  the higher the royalty rate) while the licensed equation provides for royalties of fifty percent

22  (50%) of net receipts. As a result, a recording artist or producer is paid a significantly lower

23  percentage of the total money received by Defendants for their commercial exploitation of the

24  artist or producer's master recordings under the sold equation than under the licensed equation.

25      30.    On information and belief, Defendants have entered into contracts with Digital

26  Content Providers that allow these providers to digitally distribute all or some of Defendants'

27  catalog of master recordings to end-users. In exchange, these Providers generally pay

28

*Audet &
Partners,
LLP*

SECOND AMENDED CLASS ACTION COMPLAINT          CASE NO.:  4:12-cv-01002

Defendants a flat rate or fixed percentage per digital download (typically $.70 on a $.99 download).

31.    Defendants' agreements with these Digital Content Providers constitute licenses and not sales. As such, under the Capitol Agreement, Defendants are required to pay Plaintiff and Class members 50% of the net receipts from these Digital Content Providers.

32.    In breach of its obligations under its Agreement, however, Defendants have treated their transactions with Digital Content Providers as "sales" rather than "licenses." In so doing, Defendants applied the incorrect formula for calculating royalties owed to Plaintiff and Class, taking unjustifiable deductions (including, but not limited to, the Net Sales Deduction, the Packaging Deduction, and the Audiophile Deduction), and applied a royalty percentage that is, in general, less than half of what it should be applying in its computation.

33.    On information and belief, before violating their royalty obligations to Plaintiff and the Class, Defendants vetted the policies and practices at issue in this case at the highest corporate levels; that it commissioned, either on their own initiative or with the support of music industry's trade organizations, so-called "white papers" on the issue; that they analyzed internally the financial consequences of their misconduct and cast it in terms of the additional profit to be made by them by avoiding their contractual obligations; and that they repeatedly made public statements characterizing its agreements with digital music providers in the interest of its recording artists.

34.    The Master Lease/License provision in the Capitol Agreement provides a higher royalty rate than retail sales because in cases where Defendants "lease" or "license" the master recordings, Defendants essentially act as a conduit between the artist and a third party, and thus Defendants incur none of the normal operating costs of goods sold, such as physical materials, distribution, advertising and promotion. Because Defendants incur none of the traditional costs associated with physical distribution of records when they give Digital Content Providers the right to sell digital copies of master recordings, these agreements fall within the types of situations contemplated by the parties when they agreed to the Master Lease/License provision.

SECOND AMENDED CLASS ACTION COMPLAINT                    CASE NO.:  4:12-cv-01002

*Audet & Partners, LLP*

35.     Similarly, the "Basic Royalty Rate" in the Capitol Agreement is generally computed, in part, by deducting a "packaging deduction." However, such packaging deductions are meant to compensate the record label for the physical packaging of a record, and as such, are inappropriate for digital downloads that neither have, nor require, physical packaging. Consequently, the "Basic Royalty Rate" is unascertainable for digital downloads and cannot apply.

36.     Similarly, on information and belief, Defendants have only paid Plaintiff and other Class members roughly seven and a half percent of the royalties actually owed from its licensing agreements with Ringtone Providers. A comparison of Defendants' current, illegal methodology of accounting royalties owed for its licensing agreements with Ringtone Providers and the methodology it should be employing follows:

37.     As a result of Defendants' systematic violation of their contractual obligations to Plaintiff and other Class members to make proper royalty payments and to properly credit royalty accounts pursuant to the Capitol Agreement, Defendants have caused substantial damages to Plaintiff and Class members, the exact amount of which will be determined at trial, but which likely equates to tens of millions of dollars if not more.

38.     At all relevant times, Defendants have had a duty and obligation under the recording agreements with Plaintiff and other Class members to properly and accurately account for moneys received by Defendants from Digital Content Providers, to which Defendants had licensed the master recordings of Plaintiff and Class. Rather than fulfilling their contractual obligations, however, Defendants have systematically, knowingly, and intentionally miscalculated the royalties due to Plaintiff and the other Class members. As a result, Defendants have under credited and/or underpaid each and every Class member, while also deriving substantial financial benefits from its leasing/licensing of these master recordings.

**Plaintiff's Recording Agreement**

39.     Plaintiff Graciela Beltran and Defendants' predecessor-in-interest EMI Latin Records executed a License Agreement on September 1, 1995, which governs the payment of royalties for the commercial exploitation by Defendants (the Licensee) of music recordings

9

SECOND AMENDED CLASS ACTION COMPLAINT          CASE NO.:  4:12-cv-01002

owned or controlled by Plaintiff (the Licensor). On information and belief, the Beltran License Agreement is the standard Capitol Agreement discussed above. Section (8)(a)(8) of the Capitol Agreement states: "In respect of any Master Recording leased by us to others for their distribution of Phonograph Records in the United States, we will pay you fifty percent (50%) of our net receipts from our licensee."

40.     Section 8 of the Capitol Agreement states in pertinent part: "The royalties will be payable on a semi-annual bases, less a reasonable reserve, as determined in our best business judgment, for returns, rebates and/or credits." It has long been industry practice to withhold "reserves" to ensure the Licensee, does not distribute royalties it cannot recoup on units of an album that are shipped but later returned.  This policy is "reasonable" with respect to CDs or LPs, which may be returned if the product is damaged or if the consumer wants to exchange the album with another. This policy is not reasonable with respect to the license of Digital Downloads, which cannot be returned or otherwise exchanged by consumers, and which do not require that Defendants incur any of the normal costs of production or distribution associated with physical products such as CDs and LPs. Accordingly, any "reserves" withheld on Digital Downloads is based on pure fiction and deprive Plaintiff and the Class of the full benefit of royalties they are entitled to.

41.     Plaintiff executed the above-referenced contract with Defendants on behalf of her loan-out company G.B. Tesoro Music.[2] The contract was expressly made to benefit Plaintiff, and Plaintiff is thus a real party in interest and a third-party beneficiary who may enforce the terms thereof. Under Civ. Code, section 1559, "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." See *Black & Veatch Corp. v. Modesto Irrigation Dist.*, 2012 U.S. Dist. LEXIS 2393 (E.D. Cal. Jan. 9, 2012)("Under California law, a third party may enforce a contract if the contract is 'made expressly for the benefit of a third person.'" (citation omitted)).

---

[2] G.B. Tesoro Music is a suspended corporation and has no right to prosecute this action. However, California law holds that a third-party beneficiary of an agreement, such as Plaintiff, has standing to assert her rights regardless of the executing corporation's suspension. See *Performance Plastering v. Richmond Am. Homes of California, Inc.*, 153 Cal. App. 4th 659, 668-69.

SECOND AMENDED CLASS ACTION COMPLAINT                    CASE NO.:  4:12-cv-01002

*Audet & Partners, LLP*

42.     Plaintiff's status as real party in interest and a third-party beneficiary is supported by the terms of the contract, which is entitled "EMI Latin Recording Agreement w/ 'Graciela Beltran'". See "*EMI Latin Recording Agreement w/ 'Graciela Beltran*", attached hereto as Exhibit 1. The agreement explicitly states that EMI is engaging "Graciela Beltran under G.B. Tesoro Music, professionally known as, 'Graciela Beltran.'" *Id*. The agreement is signed by Plaintiff Graciela Beltran. *Id*. Likewise, the amendment is signed by Plaintiff Graciela Beltran. *Id*. Plaintiff is the artist responsible for producing and recording the records that are the subject of the agreement, and is entitled to the royalties generated thereof. *Id.* Royalty statements produced by Defendants expressly indicate that Plaintiff is the sole beneficiary of all royalties governed by the contract. See "*Royalties Statement for the period of July 01 to December 31, 2006*", attached hereto as Exhibit 2. The "Account Name" in the above-referenced Royalties Statement is expressly and unambiguously "Beltran, Graciela" – the named Plaintiff. *Id.* Likewise, the "Payee Name" listed in the Royalties Statement is expressly and unambiguously "Beltran, Graciela" – the named Plaintiff. *Id.* Accordingly, it is indisputable that Plaintiff is a real party in interest and a third party beneficiary to the agreement with Defendants and thus has standing to enforce the terms thereof.

43.     Paragraph 9(b) of Plaintiff's contract purportedly limits the remedies available for any claim to the amount of royalties due for the accounting period concerned, and any claim must be commenced within one year of any such statement or accounting. This limitation of remedies provision is unenforceable because Defendants have intentionally and fraudulently engaged in a systematic scheme to underpay artists, producers, and their heirs the full amount owed as royalties from revenue generated from Digital Downloads. This is in spite of the Ninth Circuit's ruling in the *F. B. T Productions* case, which unambiguously held that such royalties must be paid at the contracted rate for a "license" not a "sale." This contractual breach was and is, at all time, calculated, knowingly, and totally fundamental, such that any damage limitation must, in the interest of equity and fairness, be expunged from the contract. [3]

---

[3] See *Nunes Turfgrass v. Vaughan-Jacklin Seed Co.*, 200 Cal. App. 3d 1518, 1538 (Cal. App. 5th Dist. 1988)("Pursuant to Civil Code section 1668, a party cannot contract away liability for fraudulent or intentional acts

SECOND AMENDED CLASS ACTION COMPLAINT                    CASE NO.:  4:12-cv-01002

*Audet & Partners, LLP*

44.     The terms of Paragraph 9(b) are also unenforceable because the exclusive remedy provision fails its essential purpose. See Cal. Com. Code § 2719(2)("where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code.")  The contract was drafted, agreed upon, and executed many years before the existence of Digital Downloads, and the general constriction and decline of the recording industry as a whole. By limiting damages according to the terms of Paragraph 9(b), Plaintiff and the Class Members would not be afforded a full remedy under the law. See *Computerized Radiological Servs., Inc v. Syntex Corp.*, 595 F. Supp. 1495, 1510 (E.D. N.Y. 1984) rev'd in part on other grounds, 786 F.2d 72 (2d Cir. 1986)("A limited remedy fails its essential purpose when the circumstances existing at the time of the agreement have changed so that enforcement of the limited remedy would essentially leave plaintiff with no remedy at all.")

45.     The terms of Paragraph 9(b) are unenforceable and against public policy pursuant to Cal. Civ. Code § 1668, because and to the extent that such terms attempt to exempt Defendants from responsibility for their own fraud or violations of law, including, without limitation, California's unfair competition law as set forth in California Business & Professions Code § 17200, *et seq*. See *Civic CenterDrive Apts. Ltd. Partnership v. Southwestern Bell Video Svcs.*, 295 F.Supp.2d 1091, 1105-07 (N.D.Cal. 2003); *Ting v. AT&T*, 182 F.Supp.2d 902, 923-926, 935-36 (N.D.Cal. 2002), *aff'd in part, rev'd in part*, 319 F.3d 1123 (9th Cir.), *cert. denied*, 540 U.S. 811, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003).

46.     The terms of Paragraph 9(b) are unconscionable and thus unenforceable because said terms are objectively one-sided in favor of Defendants: Defendants are the more sophisticated party that drafted the contract; the contract is adhesive in nature; the provision is buried in the middle of the document and was not made conspicuous by highlighting, capitalizing or otherwise bolding the pertinent language; the terms themselves are substantively unconscionable; and there is no equivalent limitation applicable to the damages Defendants can

---

or for negligent violations of statutory law."); see also *RRX Indus. v. Lab-Con, Inc.*, 772 F.2d 543, 547 (9th Cir. Cal. 1985)(finding that where the breach is "so total and fundamental" a consequential damages limitation should be "expunged from the contract.")

recover from Plaintiff. See *Nunes Turfgrass v. Vaughan-Jacklin Seed Co.,* 200 Cal. App. 3d 1518, 1538 (Cal. App. 5th Dist. 1988).

47.     Paragraph 15 of Plaintiff's contract provides that "no failure to perform any of our obligations hereunder shall be deemed a material breach of this Agreement[] until you have given us written notice of such breach and such breach has not be corrected, or we have not commenced to cure such breach, within forty-five (45) days after the giving of such notice." The "shall be deemed a material breach" language as used in Paragraph 24 of Personal Services Agreement is intended to mean and means only that Capitol cannot be held liable in a proceeding for breach of contract before the condition precedent is met. Plaintiff is *alleging* that Defendants are in material breach of the contract, and she seeks a judicial determination *deeming* that Defendants are in material breach of their agreements. Accordingly, this language does not preclude Plaintiff from bringing this action.

48.     Plaintiff is informed and believes that numerous artists have raised this issue with Defendants in internal account audits, in litigation, and elsewhere and have made individual settlements involving digital download claims. Defendants have never, however, offered to correct these royalty miscalculations with the remaining artists on a Class wide basis. Thus, Defendants are aware that transactions through Digital Content Providers should be counted as licenses under its Capitol Agreement.[4] Accordingly, the notice and cure provision in Paragraph 15 does not bar this action because Defendants have already received notice in multiple forms that Digital Downloads must be treated as a license for purposes of paying royalties and yet they have failed to take any action whatsoever to cure the ongoing breach. Accordingly any further

---

[4] California Civil Code section § 19 provides that "[e]very person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact." See *Sterling v. Title Ins. & Trust Co.,* 53 Cal. App. 2d 736, 748 (1942)(holding that where "reasonable care and diligence, would lead to a discovery of the truth, to a knowledge of the interest, claim, or right which really exists, then the party is absolutely charged with a constructive notice of such interest, claim, or right.").

SECOND AMENDED CLASS ACTION COMPLAINT                    CASE NO.:  4:12-cv-01002

efforts in providing notice would constitute an idle and futile act.[5] Specifically, Defendants have received notice in the following manner:

a)      In September 2010, the Ninth Circuit held that the royalty rate for digital content should be calculated using the contractual royalty provision that applies to licensing rather than sales.  *See F.B.T. Prods.*, 621 F.3d at 967.  At least since that ruling, the record industry as a whole has been on notice of its obligation to properly account and pay digital content royalties to its artists. Additionally, on December 22, 2011, Felice Catena filed a complaint in state court against Capitol Records alleging that Capitol had miscalculated and underpaid royalties for digital downloads and mastertones earned by the group The Knack at the royalty rate that Capitol knew was applicable only to phonorecords sold, not masters licensed. On February 13, 2012, Kenneth Ray Rogers (professionally known as Kenny Rogers) filed a complaint in federal court against Capitol Records alleging that Capitol Records had failed to pay royalties for digital downloads and mastertones at the appropriate license rate for the distribution of non-disc records.  Accordingly, at least since December 2011, Defendants have been on notice of its obligation to properly account and pay digital content royalties to its artists.

b)      Notwithstanding the fact that Defendants have long had constructive notice of the allegations set forth in this Complaint, in multiple forms and from multiple sources, Plaintiff has technically complied with Paragraph 15. The original Complaint in this case was filed on February 28, 2012. The First Amended Complaint was filed on March 12, 2012. The Complaint sets forth in substantial detail the allegations that Defendants have failed to pay royalties to Plaintiff and the class on Digital Downloads at the contractual rate of a license. In spite of Defendants' notice of their failure to treat Digital Downloads as licenses since at least February 2012, Defendants have refused to cure.

c)      Additionally, on June 25, 2012, Plaintiff sent a notice letter comporting with requirements of Paragraph 15 to Defendants, requesting that Defendants cure the

---

[5] California law allows for equitable excusal of contractual conditions in certain circumstances, "including circumstances making performance futile." *Gueyffier v. Ann Summers, Ltd.*, 43 Cal. 4th 1179, 1186 (Cal. 2008).

SECOND AMENDED CLASS ACTION COMPLAINT                    CASE NO.:  4:12-cv-01002

*Audet & Partners, LLP*

contractual violations alleged in Plaintiffs First Amended Complaint. See *Letter from Joshua Ezrin, dated June 25, 2012*, attached hereto as Exhibit 3. Defendants responded on June 26, 2012, expressly stating that they would not cure any of the alleged violations. See *Letter from Russell Frackman, dated June 26, 2012*, attached hereto as Exhibit 4.  Third, the notice and cure provision in Paragraph 15 is unenforceable as a matter of law because Defendants may not require notice of their own breach. See *Amelco Electric v. City of Thousand Oaks*, 82 Cal. App. 4th 373, 390 (Cal. App. 2d Dist. 2000)("a breaching party does not require, and may not insist upon written notice of its own breach.")

49.    The notice and cure provision in Paragraph 15 is unenforceable as a matter of law because a notice and cure provision cannot be used to strike a class action allegation. See *Grazia v. South Carolina State Plastering, LLC*, 390 S.C. 562, 574 (2010). The "notice and cure" provision contained in Paragraph 15 is a generalized argument against class action litigation in which the named plaintiff will never have specific standing for each individualized claim that comprises the class. *Id*. at 575. Accordingly, any attempt by Defendants to invoke the notice and cure clause is simply an improper attempt to avoid resolving this matter on a classwide basis, which is contrary to the interests of justice and judicial economy.

50.    The notice and cure provision in Paragraph 15 is unenforceable as a matter of law because a notice and cure provision does not apply when the claims are based on deceptive business practices. Plaintiff alleges that Defendants have engaged in deceptive acts and practices in violation of California Business & Professions Code §§ 17200, *et seq*., for the improper treatment of Digital Downloads as a "sale" as opposed to a "license" for purposes of paying royalties to artists, producers and their heirs. See *Schmidt v. Wells Fargo Home Mortgage*, No. 11-059, 2011 WL 1597658, at *3 (E.D. Va. April 26, 2011)(finding that "several courts have acknowledged that…notice-and-cure provisions do not extend to claims based on deceptive business practices."); s*ee also Gerber v. First Horizon Home Loans Corp.*, No. 05-1554P, 2006 WL 581082, at *3 (W.D. Wash. Mar. 8, 2006) (noting that "[this] cause of action, which involves allegations of deceptive business practices, clearly exists independent of any contract between the parties").

*Audet & Partners, LLP*

## **CLASS ACTION ALLEGATIONS**

51.     Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on their own behalf and on behalf of:

> All persons and entities, their agents, successors in interest, assigns, heirs executors and administrators who are or were parties to a Capitol Records Recording Agreement containing License provisions or their equivalent, through which such persons and entities, either directly or indirectly, received royalties on, or financial credits or adjustments for, income received for the commercial exploitation of master recordings through Defendants leasing and/or licensing of said master recordings to Digital Content Providers, at a rate less than the rate provided for in the contract.

52.     Plaintiff additionally brings this subclass action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on their own behalf and on behalf of:

> All persons and entities, their agents, successors in interest, assigns, heirs executors and administrators who are or were parties to an Capitol Records Recording Agreement containing License provisions or their equivalent, through which such persons and entities, either directly or indirectly, received royalties on, or financial credits or adjustments for, income received for the commercial exploitation of master recordings through Defendants leasing and/or licensing of said master recordings to Digital Content Providers, that was withheld as a reserve.

The following Persons shall be excluded from the Class: (1) Defendants and their subsidiaries, affiliates, officers and employees; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the judge(s) to whom this case is assigned and any immediate family members thereof.

53.     This action is properly maintainable as a class action.

54.     The Class for whose benefit this action is brought is so numerous that joinder of all Class members is impracticable. While Plaintiff does not presently know the exact number of Class members, Plaintiff is informed and believes that there are thousands of Class members, and that those Class members can only be determined and identified through Defendants' files and, if necessary, other appropriate discovery.

SECOND AMENDED CLASS ACTION COMPLAINT          CASE NO.:  4:12-cv-01002

*Audet & Partners, LLP*

55.     There are questions of law and fact which are common to Class members and which predominate over any questions affecting only individual members of the Class. These common questions include:

a)     Whether Defendants violated their recording agreements by, *inter alia*, mischaracterizing the money it received from Digital Content Providers as "sales" income rather than "license" income in violation of the recording agreements;

b)     Whether Defendants benefited financially from their wrongful acts;

c)     Whether Defendants acted in a manner calculated to conceal the illegality of their actions from recording artists and music producers;

d)     Whether Defendants will continue collecting licensing income from Digital content Providers and misrepresent the royalties due for such licensing income to their recording artists and music producers despite knowing that such misrepresentation constitutes a breach of its artists' recording contract;

e)     Whether Defendants, by way of the conduct alleged herein, must comply with California Code of Civil Procedure §§ 337, 337(a) and provide a proper accounting of the amounts owed to Plaintiff and other Class members;

f)     Whether Defendants, by way of the conduct alleged herein, engaged in deceptive or unfair acts or practices in violation of California unfair trade practices laws including, but not limited to, California Business & Professions Code §§ 17200, *et seq*. for which Plaintiff and the other Class members are entitled to recover;

g)     Whether, assuming Defendants intend to continue breaching their contractual obligations to Plaintiff and the other Class members, and/or to violate California state statutory law, declaratory and injunctive relief is appropriate to curtail its conduct as alleged herein;

h)     Whether Plaintiff and the other Class members have been damaged by Defendants' actions or conduct; and

i)     The proper measure of damages.

56.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other Class members and Plaintiff has the same interests as the other Class members. Plaintiff has no interests that are antagonistic to, or in conflict with, the interests of the other members of the Class. Plaintiff is an adequate representative of the class and will fairly and adequately protect the interests of the Class.

57.     The prosecution of separate actions by individual members of the Class could create a risk of inconsistent or varying adjudications with respect to individual members of the Class which could establish incompatible standards of conduct for Defendants or adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the members of the Class not parties to the adjudications.

58.     Furthermore, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for the individual members of the Class to redress the wrongs done to them individually.

59.     Plaintiff anticipates no unusual difficulties in the management of this litigation as a class action. Class members may be identified from Defendants' records and such Class members may be notified of the pendency of this action by mail or by electronic means (like email), using techniques and a form of notice customarily used in class actions.

60.     For the above reasons, a class action is superior to other available methods for the fair and efficient adjudication of this action.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

61.     Plaintiff repeats and realleges each and every allegation as though fully set forth herein.

62.     Plaintiff and Class members entered into a standard Capitol Agreement with Defendants or one of its affiliates.

Audet &
Partners,
LLP

63.     These agreements contained the same or substantially similar terms relating to the treatment of licensing income for royalty accounting. By definition, such licensing income includes income derived from the licensing of recordings to Digital Content Providers.

64.     Plaintiff and the other Class members have performed their obligations under these contracts by providing master recordings to Defendants to exploit.

65.     By reason of the foregoing, and other acts not presently known to Plaintiff and Class members, Defendants have materially breached their contractual obligations under the pertinent Capitol Agreement by failing to properly account for and provide for adequate royalty compensation to Plaintiff and Class members with regard to licensing of master recordings to Digital Content Providers. Further, Defendants have disregarded the rights of Plaintiff and other Class members by breaching its contractual obligations.

66.     By reason of the foregoing, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

67.     Defendants have failed and refused to cure these breaches and continue to incorrectly calculate these royalties in violation of Plaintiff's and Class members' Capitol Agreement. Further, Defendants have continued to disregard the rights of Plaintiff and the other Class members.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment)

68.     Plaintiff repeats and realleges each and every allegation as though fully set forth herein.

69.     Pursuant to the Capitol Agreement, Defendants are obligated to pay and/or credit Plaintiff and the other Class members a certain percentage of the income Defendants derive from their licensing of master recordings, produced for Defendants by Plaintiff and other Class members, to Digital Content Providers, but that Defendants have failed to provide sufficient payment/credit to Plaintiff and other Class members by illegally mischaracterizing these licenses as sales.

70.     Plaintiff and the other Class members have no adequate remedy at law.

SECOND AMENDED CLASS ACTION COMPLAINT          CASE NO.:  4:12-cv-01002

*Audet & Partners, LLP*

71.     By reason of the foregoing, there is a present controversy between Plaintiff and the other Class members, on the one hand, and Defendants, on the other hand, with respect to whether this Court should enter a declaratory judgment determining that the pertinent agreements obligate Defendants to pay and/or credit Plaintiff and other Class members the percentage specified for licensing, rather than for sales, when Defendants license such master recordings to Digital Content Providers.

### THIRD CAUSE OF ACTION
#### (Common Counts - Open Book Account:
#### California Code Civ. Pros. § 337a)

72.     Plaintiff repeats and realleges each and every allegation as though fully set forth herein.

73.     Pursuant to Defendants' agreements with Plaintiff and the other Class members, Defendants keep, and at all relevant times have kept, open book accounts reflecting the debits and credits made to each Class member's account with Defendants from inception. Plaintiff is informed and believes that said open book accounts include entries reflecting income Defendants have received, and continue to receive, from license agreements with Digital Content Providers.

74.     These book accounts constitute the principal records of the transactions between Defendants and all Class members, including Plaintiff.

75.     Plaintiff is informed and believes that said book accounts are, and at all relevant times were, created in the regular course of Defendants' business and kept in a reasonably permanent form and manner.

76.     Defendants have become indebted to Plaintiff and the other Class members on said open book accounts in an amount equal to Defendants' underpayment on the income Defendants have received, and continue to receive, from their licensees for digital downloads.

77.     As such, the outstanding balance owed to Plaintiff and the other Class members on said open book including a calculation of the amount of underpayment with respect to digital

SECOND AMENDED CLASS ACTION COMPLAINT          CASE NO.:  4:12-cv-01002

*Audet & Partners, LLP*

downloads, and can be determined by examining all of the debits and credits recorded for each account.

### FOURTH CAUSE OF ACTION

**(Violations of California's Unfair Competition Law:
California Business & Professions Code § 17200, et seq.)**

78.     Plaintiff repeats and realleges each and every allegation as though fully set forth herein. Plaintiff has standing to pursue these claims.

79.     California Business and Professions Code § 17200 prohibits any unlawful, unfair or fraudulent business acts or practices.

80.     Defendants have violated the foregoing law, by engaging in unlawful, unfair, and fraudulent business practices. Defendants knowingly breached their contracts with Plaintiff and the other Class members. Defendants either knew, should have known, or recklessly disregarded that the income collected from Digital Content Providers was in connection with a license agreement, and as such, that the royalties payable to Plaintiff and the other Class members should have been accounted and paid for on this basis. Furthermore, failing to disclose the unlawful nature of its conduct, and by employing such devices as are alleged above, as well as affirmatively representing their authority to collect and account for this income on such basis, had a tendency to mislead recording artists and producers.

81.     The harm to Plaintiff and the other Class members resulting from Defendants' deceptive and unlawful practices outweighs the utility, if any, of those practices. There is no possible economic justification for such conduct, and consequently, the gravity of the misconduct outweighs any possible economic justification offered by Defendants.

82.     Defendants' illegal conduct, as described herein, is ongoing, continues to this date, and constitutes unfair and acts and practices within the meaning of Business & Professions Code § 17200, et seq.

83.     Because Defendants have engaged in a systemic business practice of deceiving Plaintiff, the Class, and the general public regarding the actual amount owed on such "licenses,"

the notice and cure clause set forth in paragraph 15 of the contract between Plaintiff and Defendants does not apply.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other putative Class members, prays for judgment against Defendants as follows:

a.    An order certifying the proposed Class, designating Plaintiff as the named representative of the Class, and designating the undersigned as Class Counsel;

b.    A declaration that Defendants are financially responsible for notifying all Class members that the pertinent recording agreements obligate Defendants to pay and/or credit Plaintiff and other Class members the percentage specified in their contracts for licensing, rather than for sales, and that Defendants have been improperly accounting for such transactions;

c.    An injunction requiring Defendants to abide by the express terms of its Capitol Agreement with regard to licensing/leasing of master recordings to Digital Content Providers;

d.    An award to Plaintiff and the Class of compensatory, exemplary, restitutionary and/or statutory damages in an amount to be proven at trial;

e.    An award of attorneys' fees and costs, as allowed by law;

f.    An award of pre judgment and post judgment interest, as provided by law;

g.    For leave to amend the Complaint to conform to the evidence produced at trial; and

h.    Such other or further relief as may be appropriate under the law and the circumstances.

//
//
//
//
//
//
//

SECOND AMENDED CLASS ACTION COMPLAINT          CASE NO.:  4:12-cv-01002

1

## **JURY TRIAL DEMANDED**

2

Plaintiff, individually and on behalf of the class, hereby demands a trial by jury.

3

4  Dated this July 3, 2012                               AUDET & PARTNERS, LLP

5

6                                                        /s/ Joshua C. Ezrin
                                                         221 Main Street, Suite 1460
7                                                        San Francisco, CA  94105
                                                         Telephone:  415.568.2555
8                                                        Facsimile:  415.568.2556
                                                         jezrin@audetlaw.com
9

10                                                       *Attorneys for Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT            CASE NO.:  4:12-cv-01002

*Audet &
Partners,
LLP*

**Exhibit 1**



**EMI** *Latin*

Contract No. CRI-8440

March 12, 1996

**Graciela Beltran**
**G.B. Tesoro Music**
20601 Thundersky Circle
Riverside, CA  92508

RE:  **EMI LATIN RECORDING AGREEMENT w/ "GRACIELA BELTRAN"**

Dear Ms. Beltran:

The purpose of this letter is to set forth our agreement effective as of **September 1, 1995**, in the State of California for your exclusive personal services as a recording artist under the following terms and conditions:

1.  **Engagement:**  EMI Latin Records, a division of Capitol Records Inc., hereafter referred to as "EMI," "we," or "us," or "our" hereby engages Graciela Beltran under G.B. Tesoro Music, professionally known as, **"GRACIELA BELTRAN,"** hereafter referred to as "You," or "Artist" for the purpose of making records for us.

2.  **Territory:**  You hereby agree to provide us with your exclusive personal services as a recording vocalist and musician throughout the universe.

3.  **Term:**

    a.  **Initial Term:**  The Initial Period of this agreement shall be for a One (1) year term for One (1) LP-Master.  The Initial Period will commence on the date set forth above and will continue until the last day of the twelfth (12th) full calendar month following our commercial release in the United States ("USA") of the Album to be recorded and delivered by you in the Initial Period.

    b.  **Option Terms:**  Artist hereby grants us Five (5) annual options, each to renew this Agreement for an additional Option Period and for one (1) additional LP-Master.  Each Option Period shall run from its commencement until the last day of the twelfth (12th) full calendar month following our commercial release in the USA of the Album to be recorded and delivered by you during such Option Period. Said options shall run consecutively beginning at the expiration of the Initial Period.  Each option shall be deemed to have been exercised and the term hereof automatically extended thereby, unless we shall have given you notice of termination prior to the expiration of the then-current period of this Agreement.

4.  **Delivery:**  In the Initial Period, Artist shall deliver to us One (1) LP-Master with a minimum of ten (10) tracks not later than three (3) months following the date of this Agreement.  In each particular Option Period, if any, Artist shall deliver an LP-Master with a

*HOME OFFICE:*
*1750 North Vine Street*
*Hollywood, California 90028*
*Telephone: 213.871.5781*
*Telefax: 213.466.5643*

*TEXAS OFFICE:*
*4813-B Fredricksburg Road*
*San Antonio, Texas 78229*
*Telephone: 210.366.9626*
*Telefax: 210.366.3819*

*MIAMI OFFICE:*
*8181 NW 36th Street, #2*
*Miami, Florida 33166*
*Telephone: 305.477.2821*
*Telefax: 305.591.9844*

*NEW YORK OFFICE:*
*Three University Plaza, #604*
*Hackensack, New Jersey 07601*
*Telephone: 201.801.9303*
*Telefax: 201.342.2319*

*PUERTO RICO OFFICE:*
*San Jorge 167*
*Santuce, Puerto Rico 00911*
*Telephone: 809.725.6460*
*Telefax: 809.725.8530*

minimum of ten (10) tracks not later than four (4) months following
the commencement of such Option Period.

All tracks embodied on Singles and/or Albums hereunder shall be
original recordings of selections approved by us which shall not
theretofore have been recorded by Artist.  The recordings shall be
fully-mixed, leaders, sequenced, equalized and unequalized master
tapes in proper form for the production of the parts necessary to
manufacture Phonograph Records therefrom, which Masters have been
approved by us as commercially and technically satisfactory for the
manufacture and sale of Phonograph Records.

The term "delivery to us," or words of similar connotation used in
connection with Master Recordings or Masters, shall mean delivery to
a person designated by us at such location or locations designated by
us.

The delivery of any master hereunder shall include all consents,
approvals, copy information, credits, mechanical licenses and other
materials and documents required by us to release Phonograph Records
embodying those Master Recordings and to manufacture album covers or
other packaging.

5.   **Recording:**  We shall mutually agree on all repertoire to be
recorded, instrumentation, production and the producer of each of the
Masters, and all other aspects of the recording of Masters hereunder,
including the studios at which Masters will be recorded, the date of
recording the Masters and a recording budget for those Masters.   In
the event of a disagreement on any of these elements, our reasonable,
good faith decision shall control.

   a.   **Recording Funds:**  We shall pay you Seventy-Five Thousand
Dollars ($75,000), from which all recording costs shall be paid
for each album recorded hereunder.  Recording Funds shall be payable
as follows:  One-half (1/2) within fifteen (15) days after the
commencement of recording of the applicable LP-master and the balance
within fifteen (15) days after delivery to us of the applicable LP-
master.  Any amount in excess of the Recording Fund Advance must be
pre-approved by us in writing.  If our approval is not obtained, you
shall be responsible for recording costs in excess of the Recording
Fund.

   b.   **Artist Advance:**  We shall pay you an artist advance ("Art-
ist Advance") of Twenty-Five Thousand Dollars ($25,000) per album
recorded hereunder.  Payment shall be made within ten (10) days of
commencement of the applicable recording session.

   c.   **Recoupment of Recording Funds and Advances:**  All Recording
Funds, Artist Advances, producer advances and other expenses of
recording the LP-Masters and other monies paid to Artist or on
Artist's behalf, including sums paid in connection with independent
marketing and publicity and independent promotion, which are paid or
incurred by us shall be deemed advances to you, and shall be fully
recoupable from royalties otherwise payable by us to you.  All LP-



Masters delivered hereunder shall be treated under a single accounting unit.  The royalty account shall be cross-collateralized.

6.  **Audiovisual Recordings:**  Upon our request, you agree to perform at sessions for the purposes of embodying your performances in Audiovisual Recordings produced for the promotion of your recordings. We shall solely determine the Audiovisual Recording budget.  We shall have the exclusive, perpetual and universe-wide rights to all such Audiovisual Recordings for all promotional and commercial uses. Fifty Percent (50%) of the production costs shall be recoupable from any and all record royalties payable hereunder.  One hundred percent (100%) of the production costs shall be recoupable from any and all royalties payable as a result of the commercial sale of any Audiovisual Recordings produced hereunder.

7.  **Rights Granted to Us:**

    a.  **Works-made-for-hire:**  Master Recordings recorded during the term which embody the performances of the Artist, shall, for purposes of copyright law, be deemed "works-made-for-hire" for us by the Artist, and all other persons rendering services in connection with those Master Recordings, as our "employees-for-hire."  Those Master Recordings, from the inception of the recording thereof, and all Phonograph Records and other reproductions made therefrom, together with the performances embodied herein and all copyrights therein and thereto throughout the Territory, and all renewals and extensions thereof, shall be entirely our property, free of any claims whatsoever by you, or any other person, firm or corporation.  If we shall be deemed not to be the author of those Master Recordings or those Master Recordings are deemed not to be "works-made-for-hire," this agreement shall constitute an irrevocable transfer to us of ownership of copyright (and all renewals and extensions) in those Master Recordings.  Without limiting the generality of the forgoing, we and any person, firm, or corporation designated by us shall have the exclusive, perpetual and worldwide right to manufacture, sell, distribute and advertise Phonograph Records embodying those Master Recordings under any trademarks, trade names or labels, and to lease, license, convey or otherwise use or dispose of those Master Recordings by any manner or method now or hereafter known in any field of use and to perform publicly Phonograph Records and other reproductions embodying those Master Recordings, all upon such terms as we may approve, or we may refrain from doing any or all of the foregoing.

    b.  **Perpetual Rights:**  We shall have the perpetual right to use and publish and to permit others to use and publish your name (including any professional names heretofore or hereafter adopted), your likeness, and biographical material concerning you, for advertising, marketing, merchandising and other trade purposes in connection with the sale and exploitation of the masters and records produced from the Masters, or to refrain therefrom.  We shall have the right to release records manufactured from the masters recorded hereunder under the name "EMI Latin" or such other trade name or mark as we may elect.  The rights granted to us pursuant to this paragraph shall be exclusive during the Term and non-exclusive thereafter.  We shall



have the right to sell and exploit records on which Masters recorded
hereunder are coupled with masters embodying performances of other
artists.

     c.   **Exclusive ownership of Art Materials:**  As between you and
us, we shall exclusively own and control all materials comprising the
artwork (including without limitation art, photographs, phonograph
records, graphic designs, etc.) and other items created or used in
connection with the exploitation of phonograph records hereunder (the
"Art Materials"), including without limitation, all copyrights.  You
hereby grant to us the perpetual, exclusive, and worldwide right to
use and/or sublicense others to use, your name, logos and likenesses
and the name and likenesses of all other persons embodied in the Art
Materials, for the manufacture, sale and distribution of merchandise
("Merchandise Uses").  Your account shall be credited with fifty
percent (50%) of all net income (gross income received by us less
direct expenses) derived from our Merchandising Uses, after recoup-
ment for all costs incurred by us in preparation of artwork.


8.  **Royalties:**

Subject to the recoupment of applicable recoupable costs and condi-
tioned upon your full performance or all your obligations hereunder,
we shall pay you in connection with all Masters recorded and deliv-
ered hereunder, an "all-in" royalty during the term of copyright on
Net Sales of records sold by us through Normal Retail Channels
computed at the applicable percentage indicated in the rates speci-
fied below.  All costs incurred by us throughout the term of this
Agreement or any subsequent agreement shall be cross-collateralized.
Since royalties are "all in," and any producer royalties shall be
deducted therefrom.  The royalties will be payable on a semi-annual
basis, less a reasonable reserve, as determined in our best business
judgment, for returns, rebates and/or credits.

    a.  **United States and Puerto Rico:**

      (1)  **Full Priced Albums:**  We shall pay you a royalty rate
of Eighteen Percent (18%) of the wholesale card price on 100% of Net
Sales.  This royalty rate is the "Basic Royalty Rate" and is subject
to a fifteen percent (15%) packaging deduction.  The following
escalations are applicable:

| Net Unit Sales | Rate |
| --- | --- |
| 200,000 - 300,000 | 20% |
| Over 300,000 | 22% |

      (2)  **Mid-Priced Records:**  The royalty rate shall be two-
thirds (2/3) of the otherwise applicable royalty rate.

      (3)  **Budget Priced Records:**  The royalty rate shall be one-
half (1/2) of the otherwise applicable royalty rate.



(4)  **Singles and Long Play Singles:** The royalty rate shall be Ten Percent (10%) of the wholesale card price on 100% of Net Sales.

(5)  **Record Clubs:**  The royalty rate on Phonograph Records sold through "record clubs" shall be one-half (1/2) of the otherwise applicable royalty rate if manufactured and sold by us, and an amount equal to one-half (1/2) of the Net Royalty from the sale of those Phonograph Records if manufactured and sold by our licensees.

(6)  **Special Products:**  The royalty rate on Phonograph Records sold by our special products operations (SPO's) or those of the distributor of the Records concerned, including, without limitation, CEMA Special Markets (herein collectively "SPO's") shall be one-half (1/2) of the otherwise applicable royalty rate.

(7)  **New Configuration:**  Any Record in a New Configuration shall be subject to 50% of the rate otherwise applicable.

(8)  **Licensed Masters:**  In respect of any Master Recording leased by us to others for their distribution of Phonograph Records in the United States, we will pay you fifty percent (50%) of our net receipts from our licensee.  If another artist, a producer, or any other Person is entitled to royalties on sales of such Records, that payment will be divided among you in the same ratio as that among your respective basic royalty percentage rates.

(a)  **Licensed on a flat-fee or royalty basis:**  For using masters in the sale of Phonograph Records or for any other uses, the royalty rate shall be an amount equal to fifty percent (50%) of the Net Flat Fee or Net Royalty, as applicable, from such exploitation of the Masters.

(9)  **Audiovisual Records:**

(a)  Manufactured and sold by us:

U.S. Sales - 10% royalty rate
Outside U. S. Sales - 5% royalty rate

(b) Licensed to Others:

50% of the net receipts after recovery of the applicable costs.

(10) **Joint Recordings:**  The royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator which shall be one (1) and the denominator of which shall be the total number of royalty artists whose performances are embodied on a Joint Recording.  The term "Joint Recording" shall mean any Master Recording embodying the Artist's performances and any performances by another artist with respect to which we are obligated to pay royalties.



    b.   **Foreign Royalties:**  Fifty percent (50%) of the otherwise applicable rate set forth in the U.S. and P.R. Royalty Schedule above in respect of Normal Retail Channel Net Sales of the particular record concerned (i.e., Albums, Singles and Long Play Singles, if applicable), without regard to any escalations.

    c.   **Royalty "Free:"**  Phonograph Records sold or distributed by us or our licensees for promotional purposes, as cut-outs, at close-outs, for scrap, or for "free goods."

    d.   **Change in computation method:**  We may elect to compute and pay you royalties hereunder on a royalty base different than the Royalty Base Price provided herein, as long as such computation does not materially affect the net amount of royalties otherwise payable to you at that time hereunder.

    e.   **Masters with owned and non-owned tracks:**  The royalty rate on a Phonograph Record embodying Master Recordings made hereunder together with other Master Recordings will be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator of which is the number of Selections embodying Master Recordings made hereunder and contained on the particular record concerned and the denominator of which is the total number of Selections contained on such Record.

9.  **Royalty Statements:**

    a.   **Statement Periods:**  We shall send you a statement of royalties payable hereunder within sixty (60) days after the first day of January and July of each year (or such other semiannual payment dates as we may adopt) for the preceding six (6) month period together with payment of royalties, if any, less reasonable reserves for returns and credits and any then unrecouped advances or other recoupable payments.

    b.   **Audit:**  You or a certified public accountant on your behalf may, at your sole expense, at reasonable intervals, examine our books (in accordance with GAAP procedures and regulations) pertaining to the Recordings released hereunder during our usual business hours and upon reasonable notice for the purpose of verifying the accuracy of the statements sent to you hereunder.  Our books relating to activities during any accounting period may be examined only during the one (1) year period following service by us of the statement for said accounting period.

You shall be foreclosed from maintaining any action, claim or pro-ceeding against us with respect to any statement or accounting due hereunder unless such action, claim or proceeding is commenced against us in a court of competent jurisdiction within one (1) year after the date of such statement or accounting.  The scope of the proceeding will be limited to determination of the amount of royal-ties due for the accounting period concerned.  Your recovery of any such royalties will be the sole remedy available to you by reason of any claim related to such statement.



10.   **Mechanical Licenses:**

a.     **Non-Controlled Compositions:** Artist shall cause the applicable publisher(s) or administrator(s) to grant us a mechanical license to reproduce each Non-Controlled Composition on Phonograph Records and to distribute those Phonograph Records in the USA, Puerto Rico, and Canada for each different Non-Controlled Composition embodied in a record manufactured hereunder at rates which do not exceed the respective USA and Canadian statutory rates for a musical composition with a playing time of five (5) minutes ("Standard Musical Composition") in effect as of the date of this Agreement ("Statutory Rate").  For purposes of Paragraph 10., the USA Statutory Rate shall be deemed to apply to Phonograph Records distributed in Puerto Rico.

b.     **Controlled Compositions:** Artist hereby grants to us, and our designee, mechanical licenses to reproduce each Controlled Composition on Phonograph Records and to distribute those Phonograph Records in the USA, Puerto Rico, and Canada.  The royalty with respect to Controlled Compositions shall be payable on Net Sales of records and shall be equal to seventy-five percent (75%) of the Statutory Rate for each Controlled Composition embodied thereon.  The mechanical royalty rate on a Controlled Composition which is a copyrighted arrangement of a public domain work shall be fifty percent (50%) of the "Statutory Rate".  No royalty shall be paid on a Controlled Composition which has a playing time of less than ninety (90) seconds.  All terms set forth herein shall apply to "Greatest Hits", "Best Of" and Compilation albums.

c.     **Mid-Price Record/Budget Record:** Notwithstanding the foregoing, the mechanical rate for a Controlled Composition contained on a Mid-Price Record or a Budget Record shall be three-fourths (3/4) of the mechanical rate for the USA and/or Canada, as applicable, set forth in Paragraph 10.b. above.  The mechanical royalty rate on a Controlled Composition which is a copyrighted arrangement of a public domain work shall be one-half (1/2) of the mechanical rate set forth in Paragraph 10.b. with respect to similar works.

d.     **Ceilings:** The combined rates for all of the different musical compositions in an Album (containing one (1) or more discs or the tape equivalent thereof) shall not exceed the total of ten (10) times the Statutory Rate for the USA or Canada, as applicable, for the first Master recorded in connection with the Album.  The combined rates for all of the different musical compositions in a Single or Long-Play Single record shall not exceed two (2) times the Statutory Rate of the USA or Canada, as applicable, and for EP's, it shall not exceed four (4) times the Statutory Rate of the USA or Canada, as applicable.

e.     **Indemnity for amounts in excess:** We shall have no obligation to pay mechanical royalties on promotional records, sales inducement records, so-called cut-outs, or on any other Records as to which no record royalty is payable hereunder.  Artist agrees to indemnify and hold us harmless from Controlled Composition rates in excess of the amounts specified in this paragraph and/or from com-



bined rates in excess of the ceiling described in Paragraph 10.d. above.  If we pay any such excess on Controlled Compositions, or above the ceilings, such payments shall be a direct debt from you to us, which we may recover from royalties or any other monies otherwise payable by us to you hereunder.

     f.   **Statement Periods:** We will render a statement of mechanical royalties on Controlled Compositions payable hereunder within sixty (60) days after each quarter (or such other payment dates as we may adopt) for the preceding quarterly period and will pay such mechanical royalties, less reasonable reserves for returns and credits.

11.  **Definitions:**

     a.   The term "Album" shall mean an audio only long-playing Phonograph Record which is not an EP, Single, or Long-Play Single, and where the context requires, Master Recordings sufficient to constitute a long-playing audio only Phonograph Record.

     b.   The term "Audiovisual Recording" or "Audiovisual Record" shall mean a Record embodying visual images.

     c.   The term "Controlled Composition" shall mean a Musical Composition or other Selection, written or composed by you, any producer of the Masters, or any other persons engaged by you in connection with the production of Masters, in whole or in part, alone or in collaboration with others, or which is owned or controlled, in whole or in part, directly or indirectly, by you, or any person, firm, or corporation in which you have a direct or indirect interest.

     d.   The term "Master Recording" shall mean every form of recording, whether now known or unknown, embodying sound, or sound accompanied by visual images, which may be used in the recording, production, or manufacture of Phonograph Records.

     e.   The term "Masters" shall mean Master Recordings embodying the performances of the Artist recorded hereunder.

     f.   The term Mid-Priced Record" shall mean a Phonograph Record which bears a Gross Royalty Base at least twenty percent (20%) lower, but not more than thirty-five percent (35%) lower than the Gross Royalty Base applicable to our then-current highest prevailing "top-line" record of comparable repertoire and in the same configuration (e.g., Album, Multiple Record Set, Long Play , tape cassette, compact disc, etc.) released by us or our licensees in the territory concerned.

     g.   The term "Budget Record" shall mean a Phonograph Record which bears a Gross Royalty Base greater than thirty-five percent (35%) lower than the Gross Royalty Base applicable to our then-current highest prevailing "top-line" record of comparable repertoire and in the same configuration (e.g., Album, Multiple Record Set, Long Play , tape cassette, compact disc, etc.) released by us or our licensees in the territory concerned.



h.   The term "Multiple Album" shall mean an Album which contains two (2) or more units of a particular configuration of Record, which is sold as a  unit.

i.   The terms "Musical Composition" or "Composition" shall mean a  musical composition and, for the purposes of computing mechanical royalties hereunder, shall include medleys and spoken word pieces. Different versions of a Composition embodied on the same Phonograph Record will be considered one (1) Composition (and one (1) Selection) for all purposes hereunder.

j.   The term "Net Receipts" shall mean an amount equal to the gross monies received by us in the USA from a person, firm, or corporation from the exploitation by that person, firm or corporation of rights in Audiovisual Recordings (including any monies received by us for the use of Audiovisual Recordings in Audiovisual Records) less thirty percent (30%) of those gross monies as a distribution fee, and less all costs paid or incurred by us in connection with the exploitation of those rights and the collection of those monies.

k.   The term "Net Royalty" or "Net Flat Fee" shall mean the gross royalty or gross flat fee received by us in the USA from a person, firm or corporation from the exploitation by that person, firm or corporation of rights in Masters (other than Audiovisual Recordings), less all costs paid or incurred by us in connection with the exploitation of those rights and the collection of those monies, and less all royalties or other sums payable by us to any person, firm, or corporation in connection with the exploitation of those rights, except for royalties or other sums payable to producers of those Masters, which shall be borne solely by you.

l.   The term "Net Sales" shall mean one hundred percent (100%) of gross sales to wholesale and retail customers, less returns, rebates, credits and reserves against anticipated returns and credits.

m.   The term "Normal Retail Channels" shall refer to Net Sales of Phonograph Records hereunder through our principal distributor in the country in question for resale through record or other retail stores for which a royalty is paid hereunder (and, without limiting the generality of the foregoing, shall exclude sales or distributions referred to in paragraphs of 8. above).

n.   The terms "Phonograph Record" and "Record" shall mean every form of reproduction, whether now known or unknown, embodying sound alone, or sound accompanied by visual images, distributed primarily for home use, school use, jukebox use, and use in means of transportation, including, without limitation, discs of any speed or size, reel-to-reel tapes, cartridges, cassettes, or other pre-recorded tapes.

o.   The term "New Configuration" shall mean any configuration of record not specifically referred to herein.



p.    The term "Royalty Base Price" shall mean the amount speci-
fied below ("Gross Royalty Base") applicable to the Phonograph
Records concerned, less all excise, purchase, value added, or similar
taxes (included in the Royalty Base Price).

(1)   WITH RESPECT TO RECORDS (INCLUDING AUDIOVISUAL RE-
CORDS) SOLD FOR DISTRIBUTION IN THE UNITED STATES AND PUERTO RICO:
The Gross Royalty is our published subdistributor price applicable to
the price series of the unit concerned at the commencement of the
accounting period in which the sale occurs, less ten percent (10%);
or

(2)   WITH RESPECT TO RECORDS (INCLUDING AUDIOVISUAL RE-
CORDS) SOLD FOR DISTRIBUTION OUTSIDE OF THE UNITED STATES AND PUERTO
RICO:  The Gross Royalty Base is one-half (1/2) of the following:
one hundred and thirty percent (130%) of our licensee's published
price to dealers ("p.p.d.") applicable to the price series of the
unit concerned in the country of sale.

q.    The term "single" shall mean an audio-only seven inch (7")
disc Phonograph Record or its tape or other equivalent, embodying no
more than two (2) compositions.

r.    The term "Person", "person", or "Party" shall mean any
individual, corporation, partnership, association or other organized
group of persons or the legal successors or representatives of the
foregoing.

12.   **Representations and Warranties:**  You hereby represent, warrant
and agree as follows:

a.    You have the right to enter into this Agreement on all of
the terms, covenants and conditions hereof; and you have not done or
permitted anything to be done which may curtail or impair any of the
rights granted to us herein.  Neither the execution and delivery of
this Agreement nor the performance by Artist of any of the obliga-
tions hereunder will constitute a violation or breach of, or a
default under, any agreement or restriction of any kind to which
Artist is a party or by which Artist is bound.

b.    Artist acknowledges that his services in the record indus-
try are of a special, unique, unusual, extraordinary and intellectual
character which gives them a peculiar value, the loss of which cannot
reasonably or adequately be compensated for in damages in an action
at law and that a breach of the obligations hereunder will cause
irreparable injury and damage to us, entitling us to seek injunctive
and other equitable relief.

c.    During the term of this Agreement, including all renewals,
extensions, days of suspension, and all periods added by amendments
or by other agreements, (i) Artist will not perform for the purpose
of making records for anyone other than us; and (ii) Artist will not
authorize or permit the use of his name or group name, likeness, or
other identification for the purpose of distributing, selling,
advertising, or exploiting records for anyone other than us.



d.    Artist will not perform any of the repertoire embodied in the Masters recorded and delivered hereunder for the purpose of making records for anyone other than us prior to the later of:  a period of ten (10) consecutive years after delivery of such Masters; or three (3) years following the expiration or earlier termination of the Term.

e.    Artist's names, Masters, selections embodied on Masters and/or materials supplied by Artist hereunder will not violate or infringe upon any common law or statutory right of any person. Artist shall not "interpolate," "quote from," "sample," "borrow" or otherwise adapt any copyrighted music, copyrighted spoken words, copyrighted sounds, copyrighted words, copyrighted selections and/or copyrighted sound recordings (including, without limitation, any sounds accompanying copyrighted audiovisual works) owned or controlled by third parties in Masters ("Embodied Copyrighted Materials") without having first obtained the written consent of the applicable copyright proprietors of such Embodied Copyrighted Materials, and Artist's failure to obtain such written consent shall be deemed a material breach of this Agreement; provided, always, that if we, in the exercise of our reasonable business judgment, believe that Embodied Copyrighted Materials exist without such written consent from the applicable copyright proprietors, we may withhold monies and/or royalties otherwise payable to you hereunder in amounts reasonably related to potential third party liability as a result thereof.

f.    You are the sole owner of the professional name **"GRACIELA BELTRAN,"** and no other person has or will have the right to use such name in connection with Records during the Term other than us.

g.    The Artist has reached the age of majority prior to the date hereof.

h.    You hereby waive any so-called "moral rights" you may have in the Masters and Records produced hereunder.

i.    The Masters shall be free of any and all liens or encumbrances.

j.    Except as otherwise specifically provided herein, we shall have no obligation hereunder or otherwise to pay any person, firm or corporation any amounts in connection with the exercise of our rights hereunder.

13. **Indemnification**: Artist agrees to indemnify us against, and hold us harmless from, any and all claims, liabilities, causes of action, damages, expenses, costs of defense (including attorney's fees and court costs) and other costs arising out of or in any way related to any breach by Artist of or any claim, demand or action inconsistent with, any representations, warranties or agreements contained herein.  Pending the determination of any claim, demand or action, we may, at our election, withhold payment of any monies



otherwise payable to you hereunder in an amount which does not exceed your potential liability to us pursuant to this paragraph.

14. **Notices**:  All notices which either of us may be required or desire to serve upon the other shall be in writing, and shall be served by depositing same, by certified or registered mail, return receipt request, postage prepaid, in any mail box, chute or other receptacle authorized by the USA Post Office Department for mail, addressed to the applicable party at the address for such party set forth herein or such other address as you or we may designate in writing.  The date of service of any notice so deposited shall be the date of deposit.

15. **Notice and Cure**:  No failure by us to perform any of our obliga-tions hereunder shall be deemed a material breach of this Agreements until you have given us written notice of such breach and such breach has not been corrected, or we have not commenced to cure such breach, within forty-five (45) days after the giving of such notice.

16. **Applicable Law and Venue**:  This Agreement and all matters arising from or related to it shall be governed by the laws of the State of **California** applicable to contracts entered into and wholly performed therein.

17. **Entire Agreement Contained Herein**:  This Agreement contains the entire agreement between the parties hereto with respect to the matters set forth herein, and no other agreement, statement or promises made by any party, or to any employee, officer, agent or attorney for any party, which is not contained in this Agreement shall be binding or valid.


**AGREEMENT CONTINUES ON PAGE 13.**



Please indicate agreement to the foregoing by executing each original of this contract and returning them to our attention.  Once they are executed here, an original will be sent to you for your reference. We look forward to a mutually beneficial association.

Very truly yours,

EMI Latin Records

By: _____

Dave Palacio
Executive Vice President

_____5 - 8 - 9 6_____
Date

By: _____
Jose Behar
President

_____5/9/96_____
Date

ACCEPTED AND AGREED:   G.B. TESORO MUSIC

By: _____
Graciela Beltran

_____4 - 21 - 96.____
Date

FEDERAL I.D. #33-0687112



Re: CR1-8440

# AMENDMENT

This Amendment ("Amendment") is made as of this 4th day of September, 1998, by and between **EMI Latin**, a division of Capitol Records, Inc. ("EMI") and **G.B. Tesoro Music** o/b/o **"Graciela Beltran" ("Artist")**.

## RECITALS

A.     EMI and Artist are parties to an exclusive recording agreement dated as of September 1, 1995 (the "Agreement"), pursuant to which EMI engaged Artist, and Artist agreed to furnish her exclusive personal services in connection with the production of Records.

B.     EMI and Artist desire to amend the Agreement on the terms and conditions set forth herein.

NOW THEREFORE, notwithstanding anything to the contrary contained in the Agreement, as a matter of goodwill, and in consideration of the mutual promises and covenants contained herein, the parties hereto agree as follows:

1.     The following language is added to the end of the first paragraph of Paragraph 4 of the Agreement:

> "In addition to the delivery requirements set forth above, Artist agrees to record and deliver two (2) additional LP-Masters with a minimum of ten (10) tracks each, which shall consist of tracks previously recorded by Artist plus two (2) new tracks on each of the two (2) Albums ("Greatest Hits Album(s)"). Artist agrees to deliver all elements comprising the first Greatest Hits Album by no later than September 25, 1998 and all elements comprising the second Greatest Hits Album by no later than October 15, 1998. The Greatest Hits Albums will not count towards any of the delivery requirements as set forth above."

2.     The following language is added to the end of Paragraph 5a of the Agreement:

> "In addition, we will pay for the costs of recording the Greatest Hits Albums referred to in Paragraph 4 up to a maximum of $30,000 per Album. All costs advanced by us in connection with the Greatest Hits Albums will be 100% recoupable as provided in Paragraph 5c."



Page 2
Amendment to Recording Agreement
August 25, 1998

Each and every one of the remaining terms and conditions of the Agreement shall remain in full force and effect, and this Amendment shall modify the Agreement only as expressly set forth herein.

WHEREFORE, the parties have executed this Amendment as of the date first above written.

**EMI LATIN**

By: _____          9/11/98
    Jose Behar                         _____
    President                              Date

By: _____          9-10-98
    Dave Palacio                       _____
    Executive Vice President               Date


**ACCEPTED AND AGREED:  G.B. TESORO MUSIC, INC.**          G.B.

_____                9-8-98
Graciela Beltran                        _____
                                             Date



**Exhibit 2**



**EMI** Music
North America

February 26, 2007, 2

**RE: Royalties Statement for the period of July 01 to December 31, 2006**

**Account Name : Beltran,Graciela -8000134**
**Account Number: 977126/002**

We are pleased to enclose your royalty statement(s) for the above period.
If an amount is due to be paid, either a check is enclosed or, as requested
the amount has been credited directly to your bank account via electronic
funds transfer.

If you have any questions regarding the contents of your statement(s)
please contact either of the following:

Luz Encarnacion                         Phone: (212)253-3112
                                        Fax:    (212)253-3179

Alternatively. you may send a letter or email referencing your royalty
account name and number in the subject line, to the address shown below.

Regards,

Sati N. Renjen
VP Finance, Royalty Services
Phone: (212)253-3104
Fax:    (212)253-3183

EMI | Television | Music

c/o EMI Music, N.A.
Royalties Department
304 Park Avenue South
New York, NY
10010

# ROYALTY STATEMENT - SUMMARY

Page    1

| Account Name: Beltran,Graciela  -8000134 | Account Number: 977126 / 002 | Period :  July to December 2006 |
|---|---|---|

Weiner, Gerald, Gerry M. Perlstein
1875 Century Park East # 850
Los Angeles CA  USA
90067-2509

| | | SECTION | | TOTAL AMOUNT |
|---|---|---|---|---|
| PRIOR STATEMENT ENDING BALANCE | June 2006 | | | 211,350.07- |
| PAYMENT MADE | | | | .00 |
| BALANCE BROUGHT FORWARD | | | | 211,350.07- |
| DOMESTIC EARNINGS | TOTAL DOMESTIC PHYSICAL EARNINGS | A | 2,378.93 | |
| | TOTAL DOMESTIC DIGITAL/ETR* EARNINGS | H | 281.55 | |
| | RESERVES ON PHYSICAL EARNINGS | | 1,091.12- | |
| | RELEASE OF PRIOR RESERVES | | 2,459.03 | |
| | PRODUCER & OTHER DEDUCTIBLES - PHYSICAL | C | 450.77- | |
| | PRODUCER & OTHER DEDUCTIBLES - DIGITAL/ETR | J | 7.26- | |
| | NET DOMESTIC EARNINGS | | | 3,570.36 |
| FOREIGN EARNINGS | TOTAL FOREIGN PHYSICAL EARNINGS | B | 56.21 | |
| | TOTAL FOREIGN DIGITAL/ETR EARNINGS | I | .84 | |
| | RESERVES ON PHYSICAL EARNINGS | | 6.09 | |
| | RELEASE OF PRIOR RESERVES | | .05 | |
| | PRODUCER & OTHER DEDUCTIBLES - PHYSICAL | D | .14 | |
| | PRODUCER & OTHER DEDUCTIBLES - DIGITAL/ETR | K | .15- | |
| | NET FOREIGN EARNINGS | | | 55.00 |
| TOTAL CURRENT EARNINGS | | | | 3,625.36 |
| TOTAL MISCELLANEOUS ADJUSTMENTS | | F | | 2,898.43- |
| CURRENT PERIOD BALANCE | FOR ACCOUNT PAYEE INFORMATION, SEE NEXT PAGE | | | 210,623.14- |
| CURRENT STATEMENT ENDING BALANCE | BALANCES OF LESS THAN $100.00 WILL NOT BE PAID | | | 210,623.14- |

**\* ETR - Electronic Transmission Record**

# ROYALTY STATEMENT - ACCOUNT PAYEE INFORMATION

Page

| Account Name: Beltran,Graciela  -8000134 | Account Number:977126  / 002 | Period: July to December 2006 |
|---|---|---|

| Payee Name: Beltran Graciela | Account Share: |
|---|---|

| Vendor Name: Weiner, Gerald, Gerry M. Perlstein | Vendor Number:            / |
|---|---|

| Payee Transaction Type | Payment Description | Transaction Amount($) |
|---|---|---|
| Prior Period Balance Brought Forward | | .00 |
| Share of Statement Balance | | .00 |
| Payee Balance | | .00 |

No Payments were created for this statement period. The Current Period Payee Balance is being brought forward to the next statement period.

# ROYALTY STATEMENT - CURRENT DOMESTIC PHYSICAL EARNINGS SUMMARY

Page 3

| Account Name: Beltran,Graciela -8000134 | | Account Number: 977126 /002 | | | Period : July to December 2006 | | | |
|---|---|---|---|---|---|---|---|---|

| Release Number | Config | Title | Price Cat | Dist Meth | Sales Basis | Net Units | Unit Rate $ | Gross Earnings |
|---|---|---|---|---|---|---|---|---|
| 0094631139826 | CDLP | Mi Corazon Es Tuyo | MID | NORMAL | 100.00 | 26- | .722160 | 18.78- |
| 0094631139826 | CDLP | Mi Corazon Es Tuyo | MID | DSFREE | 100.00 | 0 | .722160 | .01 |
| 0094633246621 | CDLP | Lo Basico | BUD | NORMAL | 100.00 | 54 | .279225 | 15.09 |
| 0094633246621 | CDLP | Lo Basico | BUD | DSFREE | 100.00 | 13 | .279225 | 3.63 |
| 0094634253420 | CDLP | Edicion Platino | BUD | NORMAL | 100.00 | 30- | .048375 | 1.45- |
| 0094634253420 | CDLP | Edicion Platino | BUD | NORMAL | 100.00 | 30- | .177576 | 5.33- |
| 0094635150520 | CDLP | 12 Gruperas | MID | NORMAL | 100.00 | 325- | .180540 | 58.67- |
| 0094635150520 | CDLP | 12 Gruperas | MID | PX | 100.00 | 5,190 | .158610 | 823.18 |
| 0094635150520 | CDLP | 12 Gruperas | MID | DSFREE | 100.00 | 26- | .180540 | 4.69- |
| 0094636048123 | CDLP | 30 Del Recuerdo | BUD | NORMAL | 100.00 | 1,850 | .086625 | 160.25 |
| 0094636048123 | CDLP | 30 Del Recuerdo | BUD | NORMAL | 100.00 | 1,850 | .348381 | 644.49 |
| 0094636048123 | CDLP | 30 Del Recuerdo | BUD | DSFREE | 100.00 | 481 | .086625 | 41.66 |
| 0094636048123 | CDLP | 30 Del Recuerdo | BUD | DSFREE | 100.00 | 481 | .348381 | 167.57 |
| 0094636144825 | CDLP | La Fea Mas Bella | FULL | NORMAL | 100.00 | 2,860 | .124069 | 354.82 |
| 0094636144825 | CDLP | La Fea Mas Bella | FULL | NORMAL | 100.00 | 516 | .124069 | 64.01 |
| 0094637242421 | CDLP | Pa' La Raza Vol. 6 | FULL | NORMAL | 100.00 | 1,515 | .083275 | 126.17 |
| 0094637242421 | CDLP | Pa' La Raza Vol. 6 | FULL | PX | 100.00 | 14 | .073221 | 1.03 |
| 0094637242421 | CDLP | Pa' La Raza Vol. 6 | FULL | DSFREE | 100.00 | 149 | .083275 | 12.40 |
| 0094637504321 | CDLP | Navidad Para Mi Pueblo | MID | NORMAL | 100.00 | 929 | .060180 | 55.90 |
| 0094637504321 | CDLP | Navidad Para Mi Pueblo | MID | DSFREE | 100.00 | 130 | .060180 | 7.83 |
| 0724347482120 | CDLP | Al Grito De Guerra | FULL | NORMAL | 100.00 | 86- | .097155 | 8.35- |
| 0724347482120 | CDLP | Al Grito De Guerra | FULL | DSFREE | 100.00 | 2- | .097155 | .20- |
| 0724349047402 | MXDPMTA | La Historia (DVD package) | FULL | NORMAL | 100.00 | 76 | .150525 | 11.45 |
| 0724349047402 | MXDPMTA | La Historia (DVD package) | FULL | NORMAL | 100.00 | 76 | 1.043867 | 79.34 |
| 0724349047402 | MXDPMTA | La Historia (DVD package) | FULL | DSFREE | 100.00 | 11 | .150525 | 1.65 |
| 0724349047402 | MXDPMTA | La Historia (DVD package) | FULL | DSFREE | 100.00 | 11 | 1.043867 | 11.47 |
| 0724349416822 | CDLP | Robame Un Beso | MID | NORMAL | 100.00 | 3- | .722160 | 2.16- |
| 0724349993525 | CDLP | La Reyna Del Pueblo...Con Banda | FULL | NORMAL | 100.00 | 11- | 1.165860 | 12.83- |
| 0724349993549 | MCLP | La Reyna Del Pueblo...Con Banda | BUD | NORMAL | 100.00 | 1- | .326655 | .33- |
| 0724554242620 | CDLP | Los Mas Buscados Del '99 | FULL | NORMAL | 100.00 | 9- | .097155 | .87- |
| 0724554242620 | CDLP | Los Mas Buscados Del '99 | FULL | DSFREE | 100.00 | 1- | .097155 | .10- |
| 0724358267028 | CDLP | Para Mi Pueblo | FULL | NORMAL | 100.00 | 4- | 1.165860 | 4.67- |
| 0724353428325 | CDLP | Esto Es Lo Nuestro | FULL | NORMAL | 100.00 | 201 | .047644 | 9.59 |
| 0724353428525 | CDLP | Esto Es Lo Nuestro | FULL | NORMAL | 100.00 | 201 | 1.049274 | 210.91 |
| 0724353428525 | CDLP | Esto Es Lo Nuestro | FULL | DSFREE | 100.00 | 23 | .047644 | 1.09 |

*NR - Not Receipt     E - Electronic     BX - Boxed Set

SECTION  A

**Exhibit 3**

# Audet & Partners, LLP
### ATTORNEYS—AT—LAW

221 MAIN STREET, SUITE 1460
SAN FRANCISCO, CA 94105
TELEPHONE: 415.568.2555
FACSIMILE: 415.568.2556
TOLL FREE: 800.965.1461
www.audetlaw.com

June 25, 2012

<u>VIA EMAIL AND CERTIFIED MAIL</u>
Russell J. Frackman | rjf@msk.com
MITCHELL, SILBERBERG & KNAPP LLP
11377 W. Olympic Boulevard
Los Angeles, CA 90064

   Re:  *Graciela Beltran, et al. vs. Davis v. Capitol Records, LLC*, et al.

Dear Mr. Frackman,

  As you know, Audet & Partners, LLP, has been retained by Ms. Graciela Beltran. As set forth in her first amended complaint filed on March 12, 2012 in the Northern District of California (Case No. 4:12-cv-01002), Ms. Beltran's royalty payments have been improperly calculated since Capitol Records and EMI (hereinafter collectively "EMI") began licensing songs to digital content providers for use as digital downloads. The Ninth Circuit held in *F.B.T. Prods. LLC v. Aftermath Records*, 621 F.3d 958, 967 (9th Cir. 2010), that the royalty rate for digital downloads should be calculated using the contractual royalty provision that applies to licensing rather than sales.

  Although we believe that the initiation of Ms. Beltran's recent nationwide class action constituted notice under paragraph 15 of Ms. Beltran's 1996 contract, we hereby give you additional notice that any/all revenue generated from digital downloads should be treated as a license for purposes of paying royalties to Ms. Beltran and all other EMI artists. Section (8)(a)(8) of Ms. Beltran's contract states: "In respect of any Master Recording leased by us to others for their distribution of Phonograph Records in the United States, we will pay you fifty percent (50%) of our net receipts from our licensee."

  EMI has improperly credited Ms. Beltran the royalty rates applicable to net sales of phonograph records as opposed to the 50% of net receipts royalty rates applicable to licenses. Ms. Beltran is informed and believes that EMI has misapplied the royalty rate to other artists with similar contractual language. Ms. Beltran therefore hereby requests that EMI credit the appropriate lease/license royalty rate of 50% of net receipts to Ms. Beltran and all other EMI artists with similar contractual language within 30 days. If this issue is not resolved satisfactorily, Ms. Beltran will aggressively pursue her rights and the rights of the class members in her recently-filed nationwide class action lawsuit.

Capitol Records, Inc., c/o EMI Music
June 25, 2012
Page 2

       Thank you in advance for your prompt attention to this matter. I look forward to hearing from you soon.

                     Very truly yours,

                     Joshua C. Ezrin

**Exhibit 4**

## MITCHELL SILBERBERG & KNUPP LLP

A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS



Russell J. Frackman<br>
(310) 312-3119 Phone<br>
(310) 231-8319 Fax<br>
rjf@msk.com

June 26, 2012

**By E-Mail (_jezrin@audetlaw.com_) and U.S. Mail**

Joshua Ezrin, Esq.
Audet & Partners, LLP
221 Main St., Suite 1460
San Francisco, California 94105

Re:     **Capitol Records, LLC adv. Beltran**

Dear Mr. Ezrin:

This is in response to your letter dated June 25, 2012.

For a number of reasons, our client Capitol Records, LLC ("Capitol") rejects the purported notice that apparently is intended by your letter, as it is both improper and non-compliant.

As an initial matter, Capitol denies that "Ms. Beltran's royalty payments have been improperly calculated" in any way and at any time. In addition, the purported notice is infirm for at least the following reasons:

First, as you know, the district court recently granted Capitol's motion to dismiss, including holding that the contract that you reference in your letter ("the Contract") "appears on its face to be between Defendant and Beltran's 'loan-out company,' not directly with Beltran. Thus, Beltran does not have standing as a party to the contract." Ruling on Motion to Dismiss at 2 (footnote omitted). Since Ms. Beltran is not a party to the Contract at issue and the obligation to provide notice is an obligation of the party to the Contract, any purported notice by Ms. Beltran is ineffective. (We also note that the reference to Ms. Beltran's first amended complaint ignores that the motion to dismiss was granted with respect to the entirety of the first amended complaint, and a second amended complaint has not been filed; therefore, currently there is no operative complaint.)

Second, again in the recent ruling on Capitol's motion to dismiss, the Court found that compliance with the notice and cure provision is a "condition precedent" to bringing a claim. As such, the filing of Ms. Beltran's lawsuit does not and cannot constitute notice pursuant to paragraph 15 of the Contract.

11377 West Olympic Boulevard, Los Angeles, California 90064-1683<br>
Phone: (310) 312-2000 Fax: (310) 312-3100 Website: www.msk.com

Joshua Ezrin, Esq.
June 26, 2012
Page 2

Third, the Contract provides for accountings and payments (if due) be made to the contracting party, G.B. Tesoro Music. Paragraph 12(j) of the Contract provides that Capitol has no obligation to "pay any person, firm or corporation any amounts" other than to G.B. Tesoro Music. Therefore, Ms. Beltran cannot claim a breach or provide notice of a breach that cannot exist.

Fourth, Paragraph 9 of the Contract provides that Ms. Beltran cannot maintain any action, claim or proceeding unless it is commenced within one year after the date of a statement or accounting. Therefore, any claim as described in your letter is barred both by this contractual limitations provision and by the applicable statutes of limitations.

Fifth, this action has not been certified as a class action (and Capitol believes never will be). Any attempt to provide notice on behalf of "all other EMI artists with similar contractual language" is not permitted either by the Contract or as a matter of law.

As you know, and as has been Capitol's position from the beginning, the case of *F.B.T. Productions LLC v. Aftermath Records*, 621 F.3d 958, 967 (9th Cir. 2010) is not applicable, either with respect to notice or with respect to the merits of the claims asserted. Among other reasons, the decision did not discuss notice and cure at all, and more important involved a different agreement and different relevant provisions with a different company, and was made in a far different context and under vastly different circumstances.

Finally, although given the foregoing, it is a moot point, we note that the purported notice was not addressed as required by paragraph 14 of the Contract and that paragraph 15 of the Contract requires **45** days' notice, not 30 days. That is not to say that any notice that is addressed correctly and refers to 45 days will be proper. It will not.

Of course, this letter is not intended to be a complete recitation of all of our client's contentions with respect to this matter. Capitol reserves all of its rights and remedies.

Very truly yours,

Russell J. Frackman
A Professional Corporation of
MITCHELL SILBERBERG & KNUPP LLP

RJF/app